No. 100,648

Daniel J. Stechschulte, Jr., Satu S.A. Stechschulte, and the Daniel J. Stechschulte, Jr., Revocable Trust, *Appellants*, v. A. Drue Jennings, A. Drue Jennings Revocable Trust Dated October 31, 2002, Emily A. (Golson) Jennings, and PHB Realty Company, L.L.C., *Appellees.*

(298 P.3d 1083)

Opinion filed April 12, 2013.

*Brian J. Niceswanger*, of McDowell, Rice, Smith & Buchanan, P.C., of Overland Park, argued the cause, and *Dana P. Niceswanger* and *Greg T. Spies*, of the same firm, were with him on the briefs for appellants.

*Alan E. Streit*, of Larson & Blumreich, Chtd., of Topeka, argued the cause and was on the briefs for appellees Emily A. Jennings and PHB Realty Company, L.L.C.

*Andrew M. DeMarea*, of Polsinelli Shughart PC, of Overland Park, *R. Dan Boulware*, of St. Joseph, Missouri, and *Herber O. Gonzalez*, of Kansas City, Missouri, were on the briefs for appellees A. Drue Jennings and A. Drue Jennings Revocable Trust Dated October 31, 2002.

*Vernon L. Jarboe*, of Sloan, Eisenbarth, Glassman, McEntire & Jarboe, L.L.C., of Topeka, was on the brief for *amicus curiae* Kansas Association of Realtors.

The opinion of the court was delivered by

BEIER, J.: The core issue of this appeal is the legal effect of a "Buyer Acknowledgment" in a residential real estate seller's disclosure form. Does it limit or destroy the buyer's ability to pursue the seller, the seller's agent, and the agent's brokerage firm for breach of contract, fraudulent inducement and fraud by silence, negligent misrepresentation, and/or violations of the Kansas Consumer Protection Act (KCPA)? As we detail below, our resolution of this question picks up where we left off in *Osterhaus v. Toth*, 291 Kan. 759, 249 P.3d 888 (2011), and we hold that the district

court judge's summary judgment in favor of all defendants on all claims must be reversed and the entire case remanded for further proceedings.

EVIDENCE IN RECORD

The record before us contains evidence to support the following:

In May 1998, defendant A. Drue Jennings purchased a new home in Leawood. He began residing in the house in October 1998.

Four years later, in August 2002, Jennings contacted the builder of the home, William Brimacombe, about water leaks. Jennings told Brimacombe about a leak in the living room ceiling, and Brimacombe contacted Gentry Roofing to inspect the roof. Brimacombe also visited the house and observed water stains on the ceiling. The roofing inspection did not reveal a source of the leaks, and Brimacombe advised Jennings to have the windows of the home inspected.

By late October 2002, defendant A. Drue Jennings Revocable Trust took title to the home. Jennings served as trustee.

In January 2003, Jennings contacted Brimacombe again about another water leak, and Brimacombe came out to the home to inspect it, along with representatives of Gentry Roofing. The Gentry representatives observed water stains on the window sills in an upstairs loft. Brimacombe told Jennings again to have the home's windows inspected.

Jennings contacted the window subcontractor, Morgan-Wightman Supply Company, who in turn hired Excel Window & Door, Inc., to inspect the windows. Excel made eight visits to the home between August 2002 and September 2004 to evaluate leaks and/or repair windows in the home.

In August 2002, Jennings told Chris Whorton from Excel that he had noticed leaking all over the home and pointed out three areas he believed had experienced the worst leaks. Whorton observed water and dirt stains from the water leakage. During another visit, Jennings showed Whorton water stains under a section of carpet that extended approximately 2 feet from a window, along with another stain several feet from the window. Whorton told

Jennings he could either caulk all the windows or remove the trim from the home to find the source of the water problems. Jennings elected to caulk all the windows. Whorton informed Jennings that caulking the windows was a temporary "Band Aid" solution.

Excel performed two water tests on the home, one in August 2002 and another in September 2003. Jennings was present during both tests. The August 2002 test showed one window leaked between the casing and trim. The September 2003 test showed that window frame corners were leaking.

In September 2002, Jennings paid Excel $2,650 to caulk all of the windows and doors in the home, to caulk between the cedar and stucco exterior, and to caulk between the cedar and the doors and windows. Whorton testified that Jennings paid for the caulking because it was "a maintenance issue."

In May 2003, Jennings hired and paid a painter to paint the area on the living room ceiling and trim where water had leaked the prior year.

Whorton again visited the home in September 2003, and Jennings told him that all of the windows were defective and needed to be replaced. Whorton told Jennings that he would pass the information along to Morgan-Wightman, but that it was not up to Whorton whether the windows would be replaced. Excel did not make any repairs to the windows in September 2003.

Jennings testified in his deposition that, after the September 2003 testing, another round of repairs was made to the windows, but he did not indicate who performed the repairs. Jennings stated that he did not pay for this second round of repairs.

In February 2005, Jennings listed the home for sale. Jennings' fiance, defendant Emily Golson, of defendant PHB Realty Company, L.L.C. (PHB), was the listing agent for the home. (Jennings and Golson married in April 2005, and Golson changed her surname to Jennings; to avoid confusion, we refer to her throughout this opinion as Golson.)

Golson had been a licensed real estate agent since 1992. Jennings and Golson entered into an agency agreement requiring Golson, among other things, to inform potential buyers of material defects in the home of which she had actual knowledge.

Golson was in Jennings' home a couple of times a week from August 2004 to the spring of 2005, but she never noticed any evidence of water damage or leaks.

In anticipation of the home's sale, Jennings completed and signed a "Seller's Disclosure and Condition of Property Addendum" form, dated February 28, 2005. Section 1 of the disclosure, "SELLER'S INSTRUCTIONS," states: "SELLER agrees to disclose to BUYER all material defects, conditions and facts OF WHICH SELLER IS AWARE which may materially affect the value of the Property. This disclosure statement is designed to assist SELLER in making these disclosures. Licensee(s), prospective buyers[,] and buyers will rely on this information."

Section 2, "NOTICE TO BUYER," states:

"This is a disclosure of SELLER'S knowledge of the condition of the Property as of the date signed by SELLER and is not a substitute for any inspections or warranties that BUYER may wish to obtain. It is not a warranty of any kind by SELLER or a warranty or representation by the BROKER(S) or their licensees."

In Section 7, "STRUCTURAL, BASEMENT AND CRAWL SPACE ITEMS," Jennings answered "No" to question 7(d) regarding whether there was "any water leakage or dampness in the house, crawl space[,] or basement?" He also answered "No" to 7(i) regarding any repairs or other attempts to control the cause or effect of any problem described in Section 7, including water leakage or dampness in the home. Had Jennings answered "Yes" to questions 7(d) or 7(i), he would have been required to explain in detail in a space provided after Section 7, where the form instructed: "When describing repairs or control efforts, describe the location, extent, date, and name of the person who did the repair or control effort and attach any inspection reports, estimates or receipts."

In Section 14(f), "OTHER MATTERS," Jennings represented that he was not "aware of any general stains or pet stains to the carpet, the flooring, or sub-flooring." Had he indicated that he was aware of such stains, he would have been required to provide additional details.

In the paragraph preceding Jennings' signature line, the disclosure form provides:

"Disclose any material information and describe any significant repairs, improvements or alterations to the property not fully revealed above. If applicable, state who did the work. Attach to this disclosure any repair estimates, reports, invoices, notices or other documents describing or referring to the matters revealed herein:"

In the space provided, Jennings wrote: "Several windows leaked after construction; full warranty repairs were performed, and correction is complete." The form then provides:

"The undersigned Seller represents that the information set forth in the foregoing Disclosure Statement is accurate and complete. Seller does not intend this Disclosure Statement to be a warranty or guarantee of any kind. Seller hereby authorizes [his] agent to provide this information to prospective Buyers of the property and to real estate brokers and salespeople. **Seller will promptly notify Licensee assisting the Seller, in writing, if any information in this disclosure changes prior to Closing, and Licensee assisting the Seller will promptly notify Licensee assisting the Buyer, in writing, of such changes.**"

Under Jennings' signature on the form disclosure statement is a "BUYER ACKNOWLEDGMENT AND AGREEMENT," which states:

"1. I understand and agree that the information in this form is limited to information of which SELLER has actual knowledge and that SELLER need only make an honest effort at fully revealing the information requested.

"2. This property is being sold to me without warranties or guaranties of any kind by SELLER or BROKER(S) or agents concerning the condition or value of the Property.

"3. I agree to verify any of the above information, and any other important information provided by SELLER or BROKER (including any information obtained through the multiple listing service) by an independent investigation of my own. I have been specifically advised to have the property examined by professional inspectors.

"4. I acknowledge that neither the SELLER nor BROKER is an expert at detecting or repairing physical defects in the property.

"5. I specifically represent that there are no important representations concerning the condition or value of the property made by SELLER or BROKER on which I am relying except as may be fully set forth in writing and signed by them."

After completing the disclosure form, Jennings reviewed the form with Golson and discussed the prior leaks with her. Golson testified that Jennings told her about leaking, staining, and window

repairs; that the builder had been contacted; and that the repairs were complete. Golson did not verify the information in the disclosure statement or review any of Jennings' paperwork related to the repairs.

On April 3, 2005, plaintiff husband and wife Daniel J. Stechschulte, Jr., and Satu S.A. Stechschulte toured Jennings' home and, on April 5, they again toured the home and signed a contract to purchase it. The Stechschultes had not noticed any water leakage during their visits to the home, and they signed and dated the Buyer Acknowledgment on April 5.

According to Jennings, the Stechschultes came over to the home several times before closing. He recalled one instance, in particular, when Satu Stechschulte came over with her decorator and extensively examined the home.

Although Jennings provided the Stechschultes with owner's manuals related to the home and a list of subcontractors who had worked on it, he did not provide any documents related to the window repairs. He possessed only one such document, a receipt from Excel for the caulking work.

The Stechschultes hired Amerispec Home Inspectors to perform a general presale inspection of the home. The inspector did not review the disclosure form before conducting the inspection. Further, the inspector did not inspect all the windows in the home, particularly any window with furniture or personal property in front of it. The inspection report revealed no water intrusion or damage issues.

Closing on the sale of the home occurred on June 8, 2005. Prior to the closing, Satu had signed an addendum to the contract that purported to alter it from one between her and her husband on the one hand and Jennings on the other to one between only her and Jennings. Daniel did not sign the addendum, and no contract dated the day of the closing and listing only Satu Stechschulte as buyer is included in the record on appeal. The same day that the home closing took place, Satu and Daniel signed a deed transferring the home to the Daniel J. Stechschulte, Jr., Revocable Trust. The trust instrument, which would show the name of the trust settlor, does not appear in the record on appeal.

A few weeks later, on July 3, heavy rains fell in the Kansas City area, including Leawood. The Stechschultes had not yet moved into the home, but, the morning after the storm, Daniel went over to the house to check on whether it had electrical power. He discovered extensive water infiltration, including a 6- to 8-foot-wide pool of water in front of a basement window. Water was also running down the wall in front of the window, from a basement light switch, and down the sides of a sliding glass door in the living room with pools of water nearby. Water was leaking in one of the windows in the master bedroom, and water was dripping from a window in an upstairs bedroom.

The Stechschultes contacted Jennings, and he met with them in late July. The Stechschultes showed him the sites of water intrusion and asked Jennings to rescind the contract, but Jennings refused. Jennings told them that one of the reasons for his refusal was that the proceeds from the sale were already invested in his and Golson's new house.

The Stechschultes had the home evaluated by a builder, Enrico Forner, who observed a pool of water on ceramic tile in the basement, as well as evidence of water leakage in the master bedroom, loft, and hearth room. Forner observed that the painting and recaulking in the home appeared to be "fresh"—likely to have been done within 6 months before the sale. The Stechschultes also discovered a can of paint in the basement, which was labeled as expressly formulated to conceal water damage.

In August 2005, the Stechschultes hired Thermoteknix to perform an infrared scan of the home, which revealed extensive water damage. The Stechschultes also had an environmental fungal survey performed in September, which showed elevated mold levels.

## PROCEDURAL HISTORY

The Stechschultes filed this lawsuit against Jennings, the Jennings Trust, Golson, and PHB in district court in Johnson County. (Because we see nothing in the issues on appeal that requires us to distinguish between Jennings and the revocable trust for which he served as trustee, we refer to this set of defendants throughout this opinion as Jennings.)

As to Jennings, the Stechschultes alleged fraud and negligent misrepresentation for providing false representations in the disclosure form and for failure to disclose material defects and repairs. The Stechschultes later added a breach of contract claim, based on Jennings' failure to attach documents to his seller's disclosure form relating to the window repairs.

As to Golson and PHB, the Stechschultes asserted claims of negligent misrepresentation and violations of the KCPA. They alleged that Golson assisted Jennings in completing the seller's disclosure form; that she failed to exercise reasonable care in obtaining and communicating information to the Stechschultes; and that she failed to investigate Jennings' statements in the disclosure. The Stechschultes claimed PHB was vicariously liable for Golson's conduct based on a theory of respondeat superior, and they alleged that PHB had an obligation to investigate the information provided in the disclosure form before it was provided to them. They also alleged that Golson and PHB violated the KCPA by engaging in deceptive acts and practices.

During the ensuing litigation, the Stechschultes moved to amend their petition to add a claim for punitive damages against Jennings and Golson, alleging they acted willfully and wantonly by selling the home with knowledge of the water leakage problems and by failing to disclose those problems. The motion was denied, but the district judge said he would be open to reconsidering that ruling depending on how the evidence developed at trial.

Before any pretrial order had been filed, Jennings moved for summary judgment on the Stechschultes' claims of fraud and negligent misrepresentation, arguing a lack of evidence of justifiable reliance, an essential element of the claims. Jennings relied upon *Brennan v. Kunzle*, 37 Kan. App. 2d 365, 154 P.3d 1094, *rev. denied* 284 Kan. 945 (2007), and *McLellan v. Raines*, 36 Kan. App. 2d 1, 140 P.3d 1034 (2006). He argued that Paragraph 5 of the Buyer Acknowledgment in the seller's disclosure form waived the Stechschultes' right to rely on any of his representations. Jennings also argued that the Stechschultes' claim for negligent misrepresentation was barred by the economic loss doctrine and that the claim for breach of contract was precluded by the doctrine of

merger. Jennings also filed an "Alternative Motion for Summary Judgment on Breach of Contract," arguing that the Stechschultes' contract claim was barred by Paragraph 5 of the Buyer Acknowledgment. Jennings filed another "Alternative Motion for Summary Judgment on the Issue of Standing," arguing that the Stechschultes could not pursue their claims because they "lack[ed] standing and/or [were] not the real parties in interest."

The district judge granted Jennings' motion on the negligent misrepresentation and breach of contract claims, agreeing with Jennings that *Brennan* and *McLellan* controlled the outcome and that the Stechschultes had waived their right to rely on Jennings' representations. The district judge denied Jennings' motion for summary judgment on the fraud claim and on all of his other asserted grounds for judgment as a matter of law. Later, after the judge clarified his fraud ruling to permit only the Stechschultes' fraud by silence claim to survive, Jennings filed his last motion for summary judgment on that claim. After hearing argument, the district judge granted the motion.

Golson and PHB moved for summary judgment on the negligent misrepresentation and KCPA claims against them, primarily based on the Stechschultes' signature on the Buyer Acknowledgment. The district judge also granted this motion, agreeing that the Stechschultes waived reliance on any representations by Golson.

The Stechschultes appealed. A panel of our Court of Appeals reversed the district judge's summary judgment in favor of Jennings and affirmed his summary judgment in favor of Golson and PHB. *Stechschulte v. Jennings*, 43 Kan. App. 2d 47, 65, 68, 71-72, 222 P.3d 507 (2010).

The panel first concluded that Jennings' alternative bases for affirming summary judgment included in his brief—economic loss doctrine, lack of standing, and real party in interest—were not properly before the panel because Jennings failed to cross-appeal from the adverse rulings on those arguments by the district judge, as required by K.S.A. 60-2103(h).

Moving to the merits, the panel first addressed the effect of the Buyer Acknowledgement as to Jennings. The panel recognized Court of Appeals decisions that Jennings relied upon, but it elected

to follow the majority decision in the then-recently decided *Osterhaus v. Toth*, 39 Kan. App. 2d 999, 1006-16, 187 P.3d 126 (2008), *aff'd* 291 Kan. 759, 249 P.3d 888 (2011), which had parted company from *Brennan* and *McLellan*. The panel determined that the representations Jennings provided in the disclosure constituted a writing signed by the seller and that Paragraph 5 in the Buyer Acknowledgment did not waive the Stechschultes' right to rely on those representations. 43 Kan. App. 2d at 61-65.

Next, the panel held that the district court erred in treating the Stechschultes' fraud claim solely as a claim of fraud by silence. The panel observed that the "Stechschultes' petition contained numerous allegations of affirmative fraud with respect to Jennings' misrepresentations in the disclosure statement." 43 Kan. App. 2d at 68. Thus summary judgment in Jennings' favor on the Stechschultes' fraud claim was inappropriate.

As to the Stechschultes' claims against Golson and PHB, the panel regarded the fact that Golson did not sign the seller's disclosure as dispositive on negligent misrepresentation and violation of the KCPA. According to the panel, the Stechschultes "fail[ed] to identify any representations made by Golson which were set forth in writing and signed by Golson." 43 Kan. App. 2d at 70. Accordingly, the panel affirmed the district court's grant of summary judgment on the Stechschultes' claims against Golson and PHB. 43 Kan. App. 2d at 70-72.

Finally, the panel affirmed the district court's denial of the Stechschultes' motion to amend their petition to add punitive damages claims against Jennings and Golson. 43 Kan. App. 2d at 74.

Both Jennings and the Stechschultes petitioned successfully for our review.

Jennings argued in his petition that the Court of Appeals panel's result was contrary to earlier decisions from other panels, that any caselaw change should not be applied to him "retrospectively," and that he should not have been required to file a cross-appeal of the district judge's adverse ruling on his economic loss doctrine, lack of standing, and real party in interest arguments in order to preserve his right to argue those theories before the Court of Appeals or this court.

In their petition, the Stechschultes questioned whether the Buyer Acknowledgment precluded any claims against Golson and PHB and whether there was a basis to reverse the district judge's summary judgment in favor of Golson and PHB on the Stechschultes' KCPA claims.

The parties filed supplemental briefs in this court, and the Kansas Association of Realtors filed an *amicus* brief.

## DISCUSSION

### Standards of Review

At oral argument before this court, counsel for Jennings argued that, because the Stechschultes had elected to receive a remedy of rescission, their suit sounded in equity, and the district judge's role on a motion for summary judgment should therefore be expanded to include settlement of disputed fact issues. Counsel directed us to no authority supporting this novel proposition. We find none, and we reject it.

Rather, " '[s]ummary judgment should not be used to prevent the necessary examination of conflicting testimony and credibility in the crucible of a trial.' " *Esquivel v. Watters*, 286 Kan. 292, 296, 183 P.3d 847 (2008). And the standard governing appellate review of a district court grant of summary judgment is well known and often recited:

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules[,] and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citations omitted.]" *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009).

This case also involves interpretation of a written contract, and this court's review of such contracts is unlimited. *Shamberg*, 289

Kan. at 900. Our rules for interpreting contracts also are well known.

"The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction." *Anderson v. Dillard's, Inc.*, 283 Kan. 432, 436, 153 P.3d 550 (2007) (citing *Liggatt v. Employers Mut. Casualty Co.*, 273 Kan. 915, 921, 46 P.3d 1120 [2002]).

"Interpreting a written contract that is free from ambiguity is a judicial function and does not require oral testimony to determine the contract's meaning. Ambiguity in a contract does not appear until two or more meanings can be construed from the contract provisions." *Carrothers Constr. Co. v. City of South Hutchinson*, 288 Kan. 743, 751, 207 P.3d 231 (2009) (citing *Gore v. Beren*, 254 Kan. 418, 426-27, 867 P.2d 330 [1994]).

## *Our* Osterhaus *Decision*

The cross-petitions for review before us were filed before our decision in *Osterhaus*, but the parties were able to fully address the opinion in their supplemental briefs to this court and in their oral arguments. Because *Osterhaus* provides the starting point for our analysis in this case, we believe a brief review of its underlying facts and pertinent holdings is useful.

In *Osterhaus*, defendant seller Jean Betty Toth knew that the foundation in her house had major problems. She had hired an inspector who informed her that one of the interior sheetrock walls had buckled because of movement in the foundation. Nevertheless, when Toth put her house on the market, in her seller's disclosure statement designed to expose " 'all material defects, conditions and facts known to seller which may materially affect the value of the property,' " she answered " 'No' " on whether she was aware of any " 'movement, shifting, deterioration, or other problems with walls, foundations, crawl space or slab,' " " 'cracks or flaws in the walls . . . [or] foundations,' " or " 'water leakage or dampness in the . . . basement.' " 291 Kan. at 762-63. She also included a handwritten notation that the " 'north garage wall moved 1[inch]' " but had been " 'repaired.' " 291 Kan. at 763. Toth answered " 'No' " when asked if she was aware of " 'any other conditions that may materially and adversely affect the value or desirability of the property,' " and her signature on the form further represented that the information

" 'set forth in the foregoing Disclosure Statement [was] accurate and complete.' " 291 Kan. at 763-64. One offer to purchase Toth's house fell through because of foundation issues, and Toth and her real estate agent, Jeffrey S. Schunk, cooperated in obtaining epoxy repairs to 18 feet of cracks in a foundation wall.

When plaintiff buyer Osterhaus made his later offer to purchase Toth's house, he signed a Buyer Acknowledgment identical to the one at issue in this case. See 291 Kan. at 765. He hired an inspector and accompanied him on part of his inspection. Osterhaus and the inspector noticed a crack in a basement wall filled with epoxy, and the inspection report noted: " 'Poured concrete, Major cracking is noted. Repairs have been made. Appears serviceable.' " 291 Kan. at 766.

Approximately 2 years after closing on the property and taking possession, Osterhaus noticed water seeping into carpet in a finished portion of the basement of the house and, soon after, substantial water leakage coming down a foundation wall behind sheetrock, which caused mold to grow.

Osterhaus sued Toth; Schunk; and Schunk's brokerage firm, TopPros Real Estate, Inc., for deceptive and unconscionable acts under the KCPA, fraud, fraud by silence, negligent misrepresentation, and breach of contract.

The district court judge granted summary judgment on all counts in favor of the defendants, based on *McLellan*, holding that Osterhaus' signature on the Buyer Acknowledgment waived his right to rely on Toth's and Schunk's representations in the disclosure statement. The district judge also noted that Osterhaus' inspection had revealed major cracking in the basement wall.

A majority of a panel of our Court of Appeals affirmed in part, reversed in part, and ordered remand. *Osterhaus*, 39 Kan. App. 2d at 1009-14.

On petition for review, we held that *McLellan* was in error on the legal effect of Paragraph 5 of the Buyer Acknowledgment. That paragraph did not require a writing signed by the seller separate from the disclosure form that contained all representations upon which the buyer intended to rely. Rather, we ruled, Paragraph 5 serves as an integrator; its purpose is merely to protect "the seller

and the broker from the buyer's argument that the seller made *oral* representations upon which the buyer relied." (Emphasis added.) 291 Kan. at 780 (citing *ARY Jewelers v. Krigel*, 277 Kan. 464, 476-77, 85 P.3d 1151 [2004]). It does not protect a seller from the buyer's suit based on representations and failure to disclose in the form itself. The Buyer Acknowledgement cannot be read to insulate a seller, meaning he or she "can both intentionally make misrepresentations in the information [he or she] actually discloses and can intentionally fail to disclose adverse information altogether in the document ironically captioned 'Seller's Disclosure-Statement of Condition.' " 291 Kan. at 779. Rather, Paragraph 5 does not "relieve a seller of the obligation to make accurate and complete disclosures." 291 Kan. at 779.

In view of this holding, Paragraph 5 did not bar Osterhaus' breach of contract claim; it also did not bar his reliance-based claims for fraud, negligent misrepresentation, and violation of the KCPA. 291 Kan. at 779-80. In particular, Osterhaus qualified as an "aggrieved consumer" with a right to enforce the KCPA. See 291 Kan. at 779-80; K.S.A. 50-634. In addition to rejecting *McLellan*'s rationale, we also discounted similar reasoning in two Court of Appeals cases that followed it. 291 Kan. at 780-84 (discussing *Brennan*, 37 Kan. App. 2d 365; *Katzenmeier v. Oppenlander*, 39 Kan. App. 2d 259, 178 P.3d 66 [2008]).

*Osterhaus* also held that a real estate agent may be liable for negligent misrepresentation because of failure to disclose adverse property information known to the agent. 291 Kan. at 790-92. We specifically addressed language dealing with the agent's duty to disclose under the Brokerage Relationships in Real Estate Transactions Act (BRRETA), K.S.A. 58-30,101 *et seq*. 291 Kan. at 790-91 (quoting K.S.A. 58-30,106[d][3], [d][4]; K.S.A. 58-30,111[c]).

*Osterhaus* also considered defense arguments that a reasonable inspection would have uncovered the defects that were alleged to have been misrepresented or concealed, arguments the district judge had referenced. Toth pointed to Osterhaus' inspection report, which noted major cracking and repair to a basement wall. We held that the reasonableness of the inspection, as true of the existence of fraud generally, posed a question of fact for trial; we

could not say as a matter of law that Osterhaus had received notice of serious problems in the home that made him unable as a matter of law to rely on contrary representations by Toth and Schunk. 291 Kan. at 785, 792.

On this appeal, Jennings argues that application of the *Osterhaus* rules to this matter is impermissible because it would cause him substantial hardship.

The general rule is that new opinions of our court are binding on all other future cases and all cases still pending on appeal when the new opinions are filed. See *Murphy v. Nelson*, 260 Kan. 589, 597, 921 P.2d 1225 (1996). (citing *State v. Waterberry*, 248 Kan. 169, Syl. ¶ 1, 804 P.2d 1000 [1991]). An exception may be made when (1) the new opinion establishes a new rule of law; (2) retroactive application would not further the principle on which the new opinion is based; and (3) retroactive application would cause substantial hardship or injustice. *Hall v. Dillon Companies, Inc.*, 286 Kan. 777, 788, 189 P.3d 508 (2008) (citing *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 755, 27 P.3d 1 [2001]); accord *In re Estate of McDowell*, 245 Kan. 278, Syl. ¶ 2, 777 P.2d 826 (1989).

Jennings asserts substantial hardship for two reasons: (1) The *Osterhaus* decision set up a new rule of property law, on which changes are " 'usually given only prospective application, not retroactive application,' " quoting *Williams v. City of Wichita*, 190 Kan. 317, 354, 374 P.2d 578 (1962) (Schroeder, J., dissenting); and (2) he has relied to his detriment on the now-rejected reasoning and outcomes of the *Katzenmeier, Brennan,* and *McLellan* decisions from the Court of Appeals. See *Katzenmeier*, 39 Kan. App. 2d at 262-68; *Brennan*, 37 Kan. App. 2d at 387-88; *McLellan*, 36 Kan. App. 2d at 9-17.

Neither of these arguments is meritorious.

First, *Osterhaus* involved contract interpretation, common-law torts, and violation of the KCPA. It did not, in contrast to *Williams*, require examination under federal due process and state right-to-remedy guarantees of a comprehensive and revolutionary statutory scheme governing the water rights of landowners across the state. See *Williams*, 190 Kan. at 318-19, 325-26, 333-34, 340. Also, Jen-

nings fails to note that the proposition for which he cites *Williams* appears, unsupported by citation, in a dissent rather than the majority opinion. 190 Kan. at 354 (Schroeder, J., dissenting). The *Williams* majority ultimately ruled that the statutory scheme could be applied constitutionally to all landowners, not just those who acquired their land and any attendant water rights after passage of the subject act. 190 Kan. at 339-41.

Second, the earliest of the three Court of Appeals opinions Jennings attempts to invoke is *McLellan*, decided in 2006. This was the year *after* Jennings sold his home to the Stechschultes. Although it may be true that Jennings has based certain of his arguments in this litigation on *McLellan* and its younger siblings from our Court of Appeals, it is impossible that Jennings based his conduct giving rise to this litigation on those cases. Evolution of legal rules, particularly those not settled by the highest appellate court in a jurisdiction, is a constant. Its occurrence, and its effect on parties' litigation positions, is not injustice.

### Claims Against Jennings

We first discuss the continuing viability of the Stechschultes' claims against Jennings. We agree with the Court of Appeals that the district judge erred in granting summary judgment.

### Fraudulent Inducement

The elements of fraudulent inducement are: (1) The defendant made false representations as a statement of existing and material fact; (2) the defendant knew the representations to be false or made them recklessly without knowledge concerning them; (3) the defendant made the representations intentionally for the purpose of inducing another party to act upon them; (4) the other party reasonably relied and acted upon the representations; (5) the other party sustained damages by relying upon the representations. See *Chism v. Protective Life Ins. Co.*, 290 Kan. 645, 654-55, 234 P.3d 780 (2010) (elements of fraudulent misrepresentation); *Kelly v. VinZant*, 287 Kan. 509, 515, 197 P.3d 803 (2008) (elements of affirmative fraud); PIK Civ. 4th 127.40. A representation is material when it relates to some matter that is so substantial as to influ-

ence the party to whom it is made. *Kelly*, 287 Kan. at 515; PIK Civ. 4th 127.40.

The Stechschultes have advanced ample evidence to support an inference that Jennings intentionally or recklessly made false representations of existing and material facts upon which the Stechschultes relied to their detriment. Specifically, in Sections 7 and 14 regarding water leakage, staining, and other material matters, despite his knowledge of the home's history and resulting current condition, Jennings answered "No" when asked if there was *any* "water leakage or dampness in the house, crawl space[,] or basement" and "No" regarding repairs or attempts to control water leakage or dampness. He represented that he was unaware of any staining to the carpet, flooring, or sub-flooring, despite evidence that he was aware. These were existing and material facts. Jennings also represented that the information recorded on the disclosure form was accurate and complete, another existing and material fact, which, on the evidence in the record, was at least debatable. The Stechschultes, in possession of knowledge inferior to Jennings', closed on the home purchase.

Under *Osterhaus*, Jennings' arguments that Paragraph 5 of the Buyer Acknowledgment operated as a waiver of any reasonable reliance by the Stechschultes on his representations is without merit. A buyer's signature on the Buyer Acknowledgment "does not relieve a seller of the obligation to make accurate and complete disclosures" and does not waive a buyer's right to rely on the representations in the disclosure statement. *Osterhaus*, 291 Kan. at 779-80. Instead, Paragraph 5 operates as an integration clause, protecting a seller from a buyer's later allegation that the seller made representations not committed to writing upon which the buyer relied. 291 Kan. at 780. This is not the case here, when the Stechschultes' allegations have focused on misrepresentations contained within the seller's disclosure form signed by Jennings. See *Osterhaus*, 291 Kan. at 779.

*Osterhaus* also forecloses Jennings' argument that, as a matter of law, the Stechschultes could not rely on the seller's disclosure form because they failed to conduct a reasonable inspection of the windows in the home. Jennings points to the disclosure form's note

that "[s]everal windows leaked after construction; full warranty repairs were performed, and correction is complete" as dispositive. But defendant Toth made a similar argument in *Osterhaus*, based on her inclusion in the disclosure form of a note that the north garage wall had " 'moved 1[inch]' " but had been " 'repaired.' " 291 Kan. at 763. In spite of this reference, we held that whether the plaintiff buyer's general home inspection was reasonable and whether further inspections were required posed questions of fact for trial. See 291 Kan. at 784-85; see also *Brennan*, 37 Kan. App. 2d at 386 (reasonableness of buyers' inspection question of fact). Likewise, here, whether the Stechschultes' inspection was reasonable in view of the disclosures that were made is a genuine issue of material fact for trial.

The district judge's judgment in favor of Jennings on the Stechschultes' fraudulent inducement claim must be reversed and the claim remanded to the district court for further proceedings.

### Fraud by Silence

The elements of fraud by silence are: (1) The defendant had knowledge of material facts that the plaintiff did not have and could not have discovered by the exercise of reasonable diligence; (2) the defendant was under an obligation to communicate the material facts to the plaintiff; (3) the defendant intentionally failed to communicate to the plaintiff the material facts; (4) the plaintiff justifiably relied upon the defendant to communicate the material facts to the plaintiff; and (5) the plaintiff sustained damages as a result of the defendant's failure to communicate the material facts to the plaintiff. See *Miller v. Sloan, Listrom, Eisenbarth, Sloan & Glassman*, 267 Kan. 245, 260, 978 P.2d 922 (1999); PIK Civ. 4th 127.41.

The Stechschultes have advanced sufficient evidence to demonstrate the existence of genuine issues of material fact for trial on this claim. Jennings contacted his home builder more than once about water leaks, and Excel made eight visits to the home between 2002 and 2004 to inspect leaks and repair windows. Jennings was present when Excel performed two water tests on the home, and he paid $2,650 to caulk all of the home's windows and doors. He also hired a painter to paint over water stains on the living room

ceiling, and he knew about water stains. None of this information appeared in the seller's disclosure form Jennings signed, and we have already established that the issue of whether the Stechschultes should have discovered this information through a reasonable inspection is a question of fact, not law. Jennings also did not give the receipt for the window caulking to the Stechschultes until after the sale closed. The seller's disclosure form imposed a duty upon Jennings to communicate and to turn over this receipt, and there is circumstantial evidence in the record of his motivation not to do so. As with the fraudulent inducement claim, the Stechschultes' reliance to their detriment was legally cognizable under Paragraph 5 of the Buyer Acknowledgement and was supported by evidence sufficient to avoid judgment against them as a matter of law.

The judgment in favor of Jennings on the Stechschultes' fraud by silence claim must be reversed and the claim remanded to district court for further proceedings.

*Negligent Misrepresentation*

One who, in the course of any transaction in which he or she has a pecuniary interest, supplies false information for the guidance of another person is liable for damages suffered by such other person caused by reasonable reliance upon the false information if: (1) the person supplying the false information failed to exercise reasonable care or competence in obtaining or communicating the false information; (2) the person who relies upon the information is the person for whose benefit and guidance the information is supplied; and (3) the damages are suffered in a transaction that the person supplying the information intends to influence. See *Mahler v. Keenen Real Estate, Inc.*, 255 Kan. 593, 604, 876 P.2d 609 (1994); PIK Civ. 4th 127.43. Negligent misrepresentation addresses negligence of knowledge of material fact and the transmittal of already known material facts. See *Mahler*, 255 Kan. at 604 (quoting *Hutteger v. Davis*, 599 S.W.2d 506, 514 [Mo. 1980] [Welliver, J., dissenting]).

Having ruled that the Stechschultes may continue to pursue their higher-culpability claims of fraudulent inducement and fraud by silence against Jennings, we also hold that they may continue to

pursue their negligent misrepresentation claim. See *Mahler*, 255 Kan. at 604 (fraud requires proof defendant knew statement untrue; negligent misrepresentation merely requires proof defendant failed to exercise reasonable care to obtain, communicate true statement). Paragraph 5 is not a shield for the defense under *Osterhaus*, 291 Kan. at 779, and there is sufficient circumstantial evidence in the record of Jennings' lack of reasonable care in communicating the information called for in the seller's disclosure form. There can be little doubt that the form's contents were intended to influence buyers such as the Stechschultes, and their actual reliance to their detriment has been demonstrated sufficiently to avoid summary judgment.

We reverse the summary judgment on this claim and remand the claim to the district court.

### Breach of Contract

The elements of a breach of contract claim are: (1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach. *Commercial Credit Corporation v. Harris*, 212 Kan. 310, 313, 510 P.2d 1322 (1973); PIK Civ. 4th 124.01. Reliance can be a factor in a causation of damages when a buyer has agreed not to rely on representations of the seller, *i.e.*, a buyer cannot claim damages if the existence of a breach is premised on the seller's misrepresentations and the buyer never relied on those misrepresentations. See *Osterhaus*, 291 Kan. at 769.

None of the first four elements of a contract claim is in issue on this appeal. The fifth element—whether the Stechschultes suffered any damages caused by Jennings' breach—is the only element related to reliance. In short, if Paragraph 5 of the Buyer Acknowledgement relieves a seller of any responsibility to be truthful and complete in his or her disclosures because the buyer cannot rely on those disclosures as a matter of law, then any failure to fully disclose causes nothing. See *Osterhaus*, 291 Kan. at 777-79 (quot-

ing *McLellan*, 36 Kan. App. 2d at 8). We rejected this interpretation of Paragraph 5 in *Osterhaus*. 291 Kan. at 778-80.

Because the Stechschultes did not, as a matter of law, waive their right to rely on Jennings' representations in the seller's disclosure form, they may pursue a claim that their damages were caused by Jennings' failure to provide accurate and complete disclosures of material facts and documentation of the caulking, in breach of his obligations under the seller's disclosure, as integrated into the contract for the home sale. The judgment in favor of Jennings on the breach of contract claim must be reversed and the claim remanded to the district court for further proceedings.

### Claims against Golson and PHB

While we agree with the Court of Appeals regarding the claims against Jennings, we disagree with its decision to affirm summary judgment in favor of Golson and PHB on the Stechschultes' negligent misrepresentation and KCPA claims. We examine each of the claims in turn.

#### Negligent Misrepresentation

We need not repeat the elements of a claim of negligent misrepresentation set forth above in relation to Jennings. See *Mahler*, 255 Kan. at 604. Of these elements, with regard to Golson, the defendant's duty to exercise reasonable care in communicating information and in verifying the accuracy of the information conveyed, breach of those duties, and the plaintiff's reasonable reliance are key on this appeal. As to PHB, those elements also are in issue because of the vicarious liability claim. In addition, the question of whether there is a duty on the part of a seller's real estate agency to investigate and correct errors in the information provided by a seller requires scrutiny.

With regard to Golson's duty of communication, Golson and the *amicus* direct us to BRRETA in support of their argument that Golson and thus PHB were under no obligation to avoid negligent transmission of false information to the Stechschultes. BRRETA, they assert, was designed to respond to this court's 1994 decision in *Mahler*, in which we adopted Restatement (Second) of Torts §

552 (1976) and held that Kansas recognizes a cause of action for negligent misrepresentation against real estate brokers. *Mahler*, 255 Kan. at 604-05. BRRETA, Golson and the *amicus* assert, did away with this cause of action against agents and brokers by requiring actual, personal knowledge of a property defect and intentional misrepresentation about it. We disagree; the legislature's requirement of disclosure of actual knowledge of adverse information merely limited the duty owed rather than destroying it altogether.

We note first that these arguments were at least implicitly rejected in *Osterhaus*, in which the negligent misrepresentation claim against the real estate agent and his brokerage were based on a BRRETA duty and survived summary judgment. See 291 Kan. at 790-92. This case provides us an opportunity to more fully explain our rationale.

Under BRRETA, a seller's agent owes no duty to a buyer except to disclose all adverse material facts actually known by the agent, including environmental hazards, physical condition of the property, and material defects. K.S.A. 58-30,106(d)(1). An agent has no duty to conduct an independent inspection of the property or to verify the accuracy or completeness of any statement by the seller. K.S.A. 58-30,106(d)(2). This second provision dooms the Stechschultes' nonvicarious liability claim that PHB violated a duty to independently investigate and verify Jennings' statements.

With regard to information in the possession of qualified third parties such as inspectors, *i.e.*, not the seller or buyer, an agent is not required to disclose to a seller or buyer information relating to the physical condition of the property, if a written report regarding the physical condition of the property was prepared by a qualified third party and provided to the seller or buyer. K.S.A. 58-30,106(d)(3). But an agent must disclose to the seller or buyer any facts actually known by the agent that were omitted from or contradict any information in a written report prepared by such a third party. K.S.A. 58-30,106(d)(4).

BRRETA also provides that an agent shall not be liable for an innocent or negligent misrepresentation in information provided to the seller or buyer if the agent does not have personal knowledge

of the error, inaccuracy, or omission that is the basis of a claim of misrepresentation. K.S.A. 58-30,111(c).

Reading all of these provisions in harmony, as we are required to do, see *Milano's, Inc. v. Kansas Dept. of Labor*, 296 Kan. 497, 293 P.3d 707, 711 (2013), BRRETA does not eliminate the possibility of a common-law cause of action against a real estate agent or broker for negligent misrepresentation. It merely requires evidence of the agent's or broker's actual knowledge of an otherwise undisclosed adverse material fact about the subject property; that knowledge need not have been acquired through personal observation or experience, as one also has actual knowledge sufficient to meet the statutory requirement when the knowledge is acquired from another person or document. The agent or broker is not charged with responsibility for acquiring adverse information independently, only with competently passing on what is known. In this way, BRRETA does protect agents and brokers from common-law liability arising out of negligent acquisition. Negligent communication or failure to communicate adverse information is still fair game under Restatement (Second) of Torts § 552 and our *Mahler* decision. This common law is reinforced by the duty undertaken by Golson in her agency agreement with Jennings, in which she promised to inform potential buyers of material defects in the home of which she had actual knowledge.

Here, evidence in the record supports Golson's actual knowledge of material defects in Jennings' home. Jennings testified that he told Golson about the home's past water problems and what had been done to alleviate them, including telling her about the water stain on the living room ceiling, leaking in a loft window, wet carpet below the loft window, evidence of leaking in the exercise room, and a water stain on the wall of the recreation room. Golson, for her part, testified that Jennings told her about past water leakage, specifically leaks in the loft and master bath windows. Golson's failure to disclose this adverse information to the Stechschultes after Jennings reviewed the seller's disclosure form with her is amenable to characterization as a breach of her duty to disclose her actual knowledge to buyers.

On breach, Golson and PHB argue that they cannot be liable for negligently supplying false information because Golson made no affirmative representations to the Stechschultes. This argument fails. Golson may not have spoken, but she communicated by transmitting Jennings' disclosure form, some of whose content conflicted with or failed to disclose information actually in her possession. Jennings testified that he reviewed the form with Golson, as well as giving her information about leaks, repairs, and stains not mentioned in it. Golson was not free to ignore what was right before her or to remain silent.

On reliance, like Jennings, Golson and PHB seek shelter under Paragraph 5 of the Buyer Acknowledgement. *Osterhaus* rejected this blanket waiver-of-reliance argument as to all of the defendants in that case, which included the agent and his brokerage. 291 Kan. at 785. We therefore do likewise here. But, before leaving the topic of Paragraph 5's effect on a negligent misrepresentation claim against a real estate agent, we make two observations that may be deserving of additional attention on remand or in a future case. The only information in the record before us identifies Golson as a licensed agent, not as a broker; Paragraph 5 references only the seller and broker, not the agent. Also, neither Golson nor PHB signed the seller's disclosure, a fact that may retain legal significance, despite our *Osterhaus* rejection of *McLellan* and its progeny. We leave that to at least initial reconsideration and determination by the district judge on remand.

None of the arguments advanced by Golson and PHB in support of summary judgment in their favor on the Stechschultes' negligent misrepresentation claim is persuasive, although the Stechschultes' negligent misrepresentation claim against PHB must be limited to their allegation that PHB is vicariously liable for Golson's conduct and silence. We reverse the judgment on that claim and remand it for further proceedings in district court.

### Violation of the KCPA

The KCPA provides that an "aggrieved consumer" may maintain a private right of action against a supplier if: (1) the supplier willfully failed to state a material fact; or (2) the supplier willfully failed

to state, concealed, suppressed, or omitted a material fact. See K.S.A. 50-626(b)(3); K.S.A. 50-634(a).

Before discussing the parties' arguments, we must acknowledge K.S.A. 50-625(a). It was not cited by the parties, but we cannot ignore its explicit statement that a consumer cannot waive or forego rights under the KCPA. So, even if *Osterhaus* had reinforced *McLellan* and permitted Paragraph 5 of the Buyer Acknowledgment to be read as a blanket waiver of the Stechschultes' KCPA claims against Golson and PHB, K.S.A. 50-625(a) would have prevented its operation. See *Hunter v. American Rentals*, 189 Kan. 615, 618, 371 P.2d 131 (1962) ("To allow defendant to escape liability by reason of its alleged contract would be defeating the purpose and intention of the legislature as provided in the mentioned statute.").

Regardless, neither the district judge nor the Court of Appeals panel viewed the evidence in the record as adequate to repel a motion for summary judgment on the Stechschultes' claims that Golson and PHB engaged in willful conduct under the KCPA. This perplexes us. We see plenty of circumstantial evidence in the record to support an inference that Golson and thus PHB willfully omitted material facts. Both Jennings and Golson testified that she knew about the home's problems with water infiltration, its repairs, and staining; yet she disclosed nothing. Aside from the commission Golson stood to gain as a listing agent on the sale, this case has the further unusual fact that the money from the sale of the home was nearly immediately used toward the purchase of Jennings' and Golson's new marital residence. Mindful of the old saw about smoke and fire, we hold that the Stechschultes may continue their pursuit of their KCPA claims and attempt to prove that there are flames of willfulness behind the wisps of motive.

*Other Issues Raised by the Parties*

The Stechschultes also asked this court to review the district court's denial of their motion to amend to add a claim for punitive damages. Given our decision to remand all claims to the district court for further proceedings, it is premature for this court to ad-

dress the merits of this issue. The Stechschultes will have an opportunity to renew their motion in the district court.

Jennings has asked us to take up his economic loss doctrine, real party in interest, and standing issues, which the Court of Appeals declined to address because Jennings had not cross-appealed the district judge's adverse rulings. We agree with the Court of Appeals' application of the rule we enunciated in *Cooke v. Gillespie*, 285 Kan. 748, 755, 176 P.3d 144 (2008), to Jennings' economic loss doctrine and real party in interest theories. At oral argument, particularly with regard to the *Cooke* rule, counsel for Jennings merely asserted a preference for a different rule from other jurisdictions. His preference is not equivalent to legal argument.

We must, however, briefly address standing, a component of subject matter jurisdiction that may be raised for the first time on appeal. *State v. Ernesti*, 291 Kan. 54, 60, 239 P.3d 40 (2010); *Mid-Continent Specialists, Inc. v. Capital Homes*, 279 Kan. 178, 185, 106 P.3d 483 (2005) (subject matter jurisdiction may be raised at any time, in any manner, before any court). Moreover, this court has an independent duty to determine whether subject matter jurisdiction exists. See *Associated Wholesale Grocers, Inc. v. Americold Corporation*, 293 Kan. 633, 637, 270 P.3d 1074 (2011).

"Standing is a question of whether the plaintiff has alleged such a personal stake in the outcome of a controversy as to warrant the invocation of jurisdiction and justify exercise of the court's remedial powers on his or her behalf." *Varney Business Services, Inc. v. Pottroff*, 275 Kan. 20, 30, 59 P.3d 1003 (2002). Jennings challenges the standing of all three plaintiffs—Satu Stechschulte, Daniel Stechschulte, and the Daniel J. Stechschulte, Jr., Revocable Trust. Jennings has been intermittently specific as to which of the three types of pending claims—tort, contract, and KCPA—are implicated by these standing challenges.

First, as to Satu Stechschulte, it is clear that she has standing to bring all three types of claims. Regarding the tort claims, Satu signed the Buyer Acknowledgement and relied on the information Jennings provided in the seller's disclosure. If there were material defects misrepresented or undisclosed by defendants, she certainly had a personal interest that warrants her invocation of jurisdiction

and justifies the exercise of the court's remedial powers on her behalf. Regarding the contract claim, the parties agree that the real estate transaction ultimately closed in Satu's name and that the home was deeded from Jennings to her. We reject Jennings' argument that she sustained no damages because of transfer of the home to the Stechschulte trust. If her allegations of Jennings' breach of contract are ultimately credited, damages from that breach occurred at closing, when Satu acquired a home whose material defects unknown to her reduced its value. Finally, regarding the KCPA claims, we have already ruled that Satu can qualify as an aggrieved consumer under the Act.

At this juncture, it also appears that Daniel Stechschulte has standing to bring all three types of claims. Regarding the tort claims, Daniel, like his wife, signed the Buyer Acknowledgment and was listed as a buyer on the original residential real estate sale contract. He alleges that he relied on Jennings' disclosure statement, and he undertook contractual obligations based on that reliance. On the contract claim, Jennings argues that Daniel was not a party to the ultimate real estate transaction. But the addendum on which Jennings bases his argument is less than definitive on this point; Daniel's signature does not appear on it. No contract coinciding with the closing date showing only Satu as the buyer is before us. On the KCPA claims, we have already ruled that, to the extent Daniel ultimately qualified as a buyer, he can qualify as an aggrieved consumer under the Act.

Finally, as to the Stechschulte trust, there may be standing issues, but we are not in a position to rule upon them now. As to the tort claims, we simply observe that tort claims are generally not assignable. See *Glenn v. Fleming*, 247 Kan. 296, 313, 799 P.2d 79 (1990). With regard to the contract claim, it appears the Stechschulte trust was not a party to the transaction at closing. But, again, we do not have a contract that shows who signed that day as the buyer or buyers. As to the KCPA claims, there may be a valid argument, as yet unmade by defendants, that the trust cannot qualify as a consumer under the Act, regardless of whether defects in the home affect its value and lead the trust to be aggrieved. All of these challenges to the standing of the Stechschulte trust may be

addressed, after further development and presentation of the controlling facts, on remand to the district court.

We share one last observation regarding standing. In the end, the plaintiffs only receive one recovery. There is no allegation that any of the damages are unique to one or the other. So, to the extent Satu Stechschulte has standing on all claims, and she remains married to Daniel Stechschulte and affiliated with the Stechschulte trust, it may make no practical difference whether Daniel Stechschulte and the Stechschulte trust also remain in the case as plaintiffs.

## CONCLUSION

We affirm the Court of Appeals in part and reverse in part. We reverse the district court's summary judgment in favor of all four defendants on all of the plaintiffs' claims. And we remand this case to district court for further proceedings.

MORITZ, J., not participating.

DONALD R. NOLAND, District Judge, assigned.